# RECORD IMPOUNDED

## NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1022-22

STATE OF NEW JERSEY
IN THE INTEREST OF
J.D.,[1] a juvenile.

_____

Argued January 6, 2025 – Decided January 21, 2025

Before Judges Sabatino and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FJ-12-0465-21.

Michael Denny, Assistant Deputy Public Defender, argued the cause for appellant J.D. (Jennifer N. Sellitti, Public Defender, attorney; Michael Denny, of counsel and on the briefs).

Hudson E. Knight, Assistant Prosecutor, argued the cause for respondent State of New Jersey (Yolanda Ciccone, Middlesex County Prosecutor, attorney; Hudson E. Knight, of counsel and on the brief).

PER CURIAM

---

[1] We use initials to protect appellant's privacy interests. R. 1:38-11(b).

Appellant J.D. appeals the Family Part's October 21, 2022 decision adjudicating him delinquent for two counts of first-degree aggravated sexual assault, in violation of N.J.S.A. 2C:14-2(a)(7), and denial of his motion for acquittal. At issue in this appeal is whether the trial judge erred in sustaining the State's relevance objection precluding statements made by the victim, C.M.,[2] to the police, whether the trial judge erred in refusing to impose an adverse inference for the State's failure to call C.M.'s former friend, M.Z., to testify, and whether the trial judge erred in finding C.M. credible and relying upon his testimony to adjudicate J.D. delinquent.

Because the record is devoid of any evidence or detailed analysis regarding the relevancy of the statements made by the victim, we remand for an in-camera review, and, if necessary, a hearing pursuant to N.J.R.E. 104, to determine whether any of the statements C.M. made to the police are relevant to J.D.'s prosecution. We affirm the trial judge's decision to not impose an adverse inference against the State and decline to address the issue of C.M.'s credibility because of our remand.

---

[2] We understand that, at the time of this appeal, victim-witness C.M. is deceased.

I.

We discern the following facts from the trial record. Sergeant Julissa Alvarado, who at the time was a detective in the Special Victims Unit of the Middlesex County Prosecutor's Office, received a call from C.M. on February 18, 2020, where he alleged, he was "raped by [J.D.] . . . many years ago." This initial phone call prompted Sergeant Alvardo to schedule an interview with C.M. on February 21, 2020, where she was accompanied by Sergeant Daniel Ellmyer of the Sayreville Police Department. During this interview, C.M. accused J.D. of sexually assaulting him on two separate occasions when they were both beginning their sophomore year of high school, nearly thirty years prior to the interview. As a result, a juvenile delinquency complaint was filed[3] charging J.D. with two counts of aggravated sexual assault, in violation of N.J.S.A. 2C:14-2(a)(7).

At a bench trial before the Family Part,[4] C.M. testified J.D. had performed oral sex on him without his consent while he was asleep at J.D.'s house after

---

[3] Although he was charged as a juvenile and adjudicated delinquent, J.D. was forty-four years old when he was charged on April 28, 2021.

[4] See N.J.S.A. 2A:4A-24(a) (granting the Family Part exclusive jurisdiction in all juvenile delinquency matters).

attending their high school football game together. C.M. testified that at the time of the assault he was unsure whether he was dreaming, and it was not until days later he finally determined he had been sexually assaulted by J.D.

C.M. then testified to another sexual assault, occurring several weeks after the first, when he slept over J.D.'s house while accompanied by his friend, M.Z. Despite the first sexual assault weeks prior, C.M. explained he slept over J.D's house on this occasion because M.Z., who did not testify, made him feel he was safe in J.D.'s home. However, after falling asleep, C.M. awoke to find M.Z. had left J.D's house. Although he realized M.Z. was no longer there, C.M. stated he went back to sleep, with only J.D. left in the room with him. C.M. testified he awoke again sometime later to find J.D. "laying on top of [him] with [his] pants down and [his] underwear down close to [his] knees . . . trying to anally penetrate [him]." C.M. testified he knew it was J.D. who was on top of him because he heard J.D.'s voice saying, "I know you're awake and you probably like this," and saw J.D.'s face in the light of the television. C.M. also testified he knew he was being anally penetrated because could feel sharp pain as a result of J.D.'s actions.

C.M. testified he never spoke to anyone, including J.D. or M.Z., until his phone call to Sargeant Alvarado about the two sexual assaults because "[t]he mocking and the shame and everything that went with it back [thirty] years ago

would have probably drove [him] to suicide," and because J.D.'s sister dated, and eventually married, his brother. C.M. also testified that, after he read a news article implicating J.D. in other crimes, he finally came forward and informed the police about the assaults because he "didn't want this to continue going on."

After C.M.'s testimony, Sergeant Alvarado testified as to C.M.'s initial phone call to police reporting the sexual assaults and the subsequent interview she had with C.M. regarding the assaults. Sergeant Alvardo testified C.M. had indicated on the phone he was reaching out because he was "concerned for the nieces and nephews that [he] had in common" with J.D.

C.M.'s mother then testified she had noticed a "change" in C.M. "around the age of [fifteen]" when he was a sophomore in high school amounting to a "[d]ramatic 180 in his personality" where he went "from a very outgoing, happy, kind of go-lucky, young man, to a very angry young man."

Thereafter, Sergeant Ellmyer testified similarly to Sergeant Alvarado regarding the intake interview with C.M. During his testimony, he was asked by J.D.'s counsel whether he was aware of any statements from C.M. relative to any criminal matter at any time. The following colloquy ensued:

> Q: Okay. Are you aware of any statements obtained by any other law enforcement agency, including the Middlesex County Prosecutor's office from C.M.

5

relative to this matter or another criminal matter at any time?

A: Yes sir.

Q: You are aware of other statements taken from C.M.?

A: If you are being specific to any other time that is not relevant to this case [?].

Q: Yes.

A: Yes.

Q: Do you know what those statements were obtained in connection with?

[PROSECUTION]: Objection as to relevance Your Honor.

[DEFENSE]: It is relevant with regards to the fact that if he made statements, you know obviously this individual has [thirty-]year[-]old allegations[,] if he made statements before in connection to the criminal matter that may or may not have been allegations against my client. Those statements may involve allegations relative to this matter. You know, it is certainly the case that the evidence establishes that the victim—the alleged victim is very willing to participate in anyway [sic] to help the prosecutor's office and this seems to be his avenue chosen to do so. I have no reason at this time to believe that he would change those methods and so if he is speaking with the prosecutor's office in connection with other matters[,] I would find it hard to believe that it wouldn't touch upon this. He might have provided statements that are relevant to this matter. I just would not[e] that this is the first time I am hearing about the statements.

6

THE COURT:  The objection is sustained.

. . . .

(Sidebar conference begins . . . .)

[DEFENSE]:  Your Honor, just now the witness testified that there were statements taken from [C.M.].

. . . .

[DEFENSE]:  We are entitled to those statements and we have never been given them.  Whether the question[] is objectionable is one thing.  But in terms of the discoverability of the statements of a witness that the State is in possession of, we are entitled to those.  They withhold—have withheld that evidence from us and we have asked for all statements of these witnesses since the beginning of the case and they have never been produced.

. . . .

[DEFENSE]:  We are asking for an order for the State to produce the statements of the witnesses.  One who has already testified that we weren't given the benefit of that statement—

THE COURT:  They don't relate to this proceeding.

[DEFENSE]:  Well we don't know that.

THE COURT:  Counsel, I am denying your request.

A-1022-22

Finally, J.D. testified in his own defense. J.D. denied all the allegations made by C.M. He challenged C.M's testimony regarding the first assault, contending C.M. would never have gone back to his house after a football game as defendant always went to a post-game party with the team, which he doubted C.M. ever attended. J.D. also testified he and C.M. remained friends throughout high school and beyond, stating he attended C.M.'s wedding and would often attend family functions with C.M. Finally, J.D. testified C.M.'s change in behavior during high school was explained by mental health problems as C.M. was allegedly suicidal after a then-recent bad breakup.

In a May 20, 2022 oral opinion, the trial court found "[w]hile [J.D.'s] testimony was in good contrast to the testimony of [C.M.], as it related to the sexual incidents and the change in frequency of sleepovers after sophomore year, [J.D.'s] testimony was unconvincing in its attempts to paint a picture of [C.M.] as unstable during that time." The trial court determined although C.M.'s testimony regarding "the exact details of every circumstance surrounding the two [sexual assaults] that occurred over [thirty] years ago" were at times "uncertain and . . . inconsistent the salient details were not" and C.M.'s testimony "bore the ring of truth." The trial court also found "[C.M.'s] demeanor was calm and straightforward during his testimony" and minor inconsistencies in his

testimony "were not willful and were not material" as to "warrant an automatic discounting of [his] testimony as incredible." It concluded C.M. lacked a "motivation to lie and the fact that [he] contacted Alvarado because he wanted to aid the prosecution to protect others served as the reason behind his finally telling his experience after [thirty] plus years."

The trial court also declined to take an adverse inference[5] against the State for failing to call M.Z. as a witness because he "was not particularly within the control of only one party," and his "testimony would not elucidate relevant and critical facts nor be superior to that already utilized [because he] was not present during the . . . aggravated sexual assaults." Based on these findings, the trial court adjudicated J.D. delinquent on two counts of aggravated sexual assault in violation of N.J.S.A. 2C:14-2(a)(7).

At the October 21, 2022 sentencing hearing, J.D.'s motion for acquittal notwithstanding the verdict and his motion for a new trial were denied, with the trial court relying on its May 20, 2022 oral opinion and finding both motions untimely. The trial court thereafter issued a final disposition adjudicating J.D. delinquent on two charges of first-degree aggravated sexual assault, in violation

---

[5] Defendant argues the trial court erred in failure to make an adverse interest "charge," but a charge was not relevant to this matter as this was a bench trial and there was no jury.

A-1022-22

of N.J.S.A. 2C:14-2(a)(7) on October 21, 2022. J.D. was sentenced to a four-year custodial sentence to the Juvenile Justice Commission[6] on each count, running concurrently, and a registration requirement pursuant to Megan's Law, N.J.S.A. 2C:7-2. J.D.'s sentence also included a sixteen-month term of post-incarceration supervision equivalent to one-third of his custodial term, pursuant to N.J.S.A. 2A:4A-44(d)(5). This appeal followed.

## II.

We review a trial court's discovery rulings pursuant to the abuse of discretion standard and "generally defer to a trial court's disposition of discovery matters unless the court has abused its discretion or its determination is based on a mistaken understanding of the applicable law." State v. Brown, 236 N.J. 497, 521 (2019) (internal quotations omitted) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011)).

Our review of juvenile delinquency adjudications is "extremely narrow" as "[w]e must give deference to those findings of the trial judge which are substantially influenced by his or her opportunity to hear and see the witnesses

---

[6] Although adjudicated delinquent, J.D. is currently incarcerated in an adult prison. See N.J.S.A. 2A:4A-37(d)(2) (individuals twenty years of age or older adjudicated delinquent "shall be incarcerated in the county jail unless good cause is shown").

and have the 'feel' of the case, which we do not enjoy upon appellate review." State in the Int. of S.B., 333 N.J. Super. 236, 241 (App. Div. 2000). Accordingly, our review "is limited to evaluation of whether the trial judge's findings are supported by substantial, credible evidence in the record as a whole." State in the Int. of D.M., 238 N.J. 2, 15 (2019) (internal quotations omitted) (quoting State in the Int. of J.P.F., 368 N.J. Super. 24, 31 (App. Div. 2004)). "If we are satisfied that the findings and result meet this criterion, our task is complete, and we may not disturb the result, even though we may feel we may have reached a different conclusion." Ibid. (internal quotations omitted) (quoting S.B., 333 N.J. Super. at 241 (App. Div. 2000)).

A. Relevancy of C.M.'s Statement in Other Matters.

With respect to the relevance of C.M.'s statements to law enforcement in other matters, we conclude the trial court improperly ruled the statements were not relevant without making sufficient inquiry into the potential relevancy of the statements.

"'Relevant evidence' means evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401; see also State v. Santamaria, 236 N.J. 390, 405 (2019) (quoting State v. Cole, 229 N.J. 430, 448 (2017)) ("[T]he relevancy threshold is met '[o]nce a

logical relevancy can be found to bridge the evidence offered and a consequential issue in the case.'").  "[T]he court should be mindful of the 'full factual setting' of the case and should allow 'a certain amount of leeway' to the proponent of the evidence."  State v. Burr, 395 N.J. Super. 538, 560 (App. Div. 2007) (quoting Lowenstein v. Newark Bd. of Educ., 35 N.J. 94, 105 (1961)).  Despite this discretion, defendants cannot misuse the low burden of establishing relevance by embarking on a "'fishing expedition' . . . 'transform[ing] the discovery process into an unfocused, haphazard search for evidence.'"  State v. Ramirez, 252 N.J. 277, 296 (2022) (first quoting State v. R.W., 104 N.J. 14, 28 (1986), then quoting State v. D.R.H., 127 N.J. 249, 256 (1992)).

In juvenile delinquency matters, the prosecution is required to disclose "relevant material" including "record[s] of statements, signed or unsigned. . . ."  N.J.R.E. 5:20-5(b)(1)(F), (G).  "In the same vein, . . . the State [must] provide defendant with 'material evidence affecting [the] credibility' of a State's witness whose testimony may be determinative of guilt or innocence."  State v. Stein, 225 N.J. 582, 596 (2016) (quoting Hernandez, 225 N.J. at 462).  The furnishing of this evidence "'is appropriate if it will lead to relevant' information."  Ibid. (emphasis in original) (quoting Hernandez, 225 N.J. at 462).

J.D. claims the statements Sergeant Ellmyer testified C.M. made to police, if admitted, could have been used to expose "any inconsistent or contradictory information" or any "false accusations made by C.M. regarding other people" that "could have tipped the scales and made the court more likely to believe J.D.'s denial of the charges."

We find sufficient merit to J.D.'s argument to warrant redress. Although J.D. would not be entitled to use statements made by C.M. in wholly unrelated matters against other defendants, we do not know if the statements made involved J.D. in other matters. C.M. and J.D. were related by marriage and had been acquainted for over forty years. The record discloses J.D. had been implicated in another, unrelated matter and it is possible C.M. gave a statement to the police with respect to that matter. It is unknown whether C.M.'s statements involved J.D. at all. If the statements alluded to by Sergeant Ellmyer involved J.D., they would be relevant as to C.M.'s credibility and available to J.D. for impeachment purposes. See N.J.R.E. 608(c); N.J.R.E. 613(b); N.J.R.E. 803(a)(1). Moreover, if C.M.'s statements mentioned J.D., they could potentially corroborate C.M.'s in-court testimony and the statements he made during the February 21, 2021 interview, or they could potentially exculpate J.D. if inconsistent with C.M.'s in-court testimony and interview statements.

If inconsistent, these statements would be potentially exculpatory evidence the State is required to disclose to the defense, see R. 5:20-5(b)(1), especially because the State's case almost exclusively relied on C.M.'s testimony. The State's failure to produce these inconsistent statements would amount to a Brady violation, depriving J.D. of his constitutional right to a fair trial. See State v. Brown, 236 N.J. 497, 518 (2019) (emphasis added) (A Brady violation evidencing the deprivation of a defendant's right to a fair trial is present when "(1) the evidence at issue [is] favorable to the accused, either as exculpatory or impeachment evidence; (2) the State [has] suppressed the evidence, either purposefully or inadvertently; and (3) the evidence [is] material to the defendant's case." (citing Brady v. Maryland, 373 U.S. 83, 87 (1963))).

We conclude the trial court erred in sustaining the relevance objection without further inquiry and reasoned elaboration, as the record does not indicate whether C.M.'s statements involved J.D. Upon remand, the trial court, in its discretion, may review the statements in-camera to determine their relevancy or, if necessary, conduct a hearing pursuant to N.J.R.E. 104 to address whether C.M.'s statements are relevant and admissible. If any of the statements are admissible, the trial court may review its prior rulings consistent with the new evidence and revise or re-publish its previous findings, as appropriate, or order

14                                                                                    A-1022-22

a new trial regarding J.D.'s delinquency adjudication. Although we understand C.M. is now deceased and, as such, an unavailable witness, a new trial would require the court to consider any implications of the potential application of to the Rape Shield law, N.J.S.A. 2C:14-7, and Rule 806 impeachment of unavailable declarants.

B.    Failure to Make an Adverse Inference.

We review "whether the trial court was empowered to impose the sanction of an adverse-inference charge" de novo because it is a legal issue, and we owe no deference to the trial court's analysis. State v. Dabas, 215 N.J. 114, 131 (2013). "When 'a party fails to produce a witness who is within its power to produce and who should have been produced,' the adverse inference rule permits the factfinder 'to infer that the witness's evidence is unfavorable to the party's case.'" Washington v. Perez, 219 N.J. 338, 352 (2014) (quoting Black's Law Dictionary 62 (9th ed. 2009)). However, we consistently apply requests for adverse inferences "with caution, requiring a case-specific analysis to determine whether [it] is warranted in a particular setting." Id. at 353; see also State v. Cooper, 10 N.J 532, 566 (1952) (holding "the mere failure to produce a witness does not of itself permit" an adverse inference charge).

For an adverse inference to be appropriate, the trial court must demonstrate

> (1) that the uncalled witness is peculiarly within the control or power of only the one party, or that there is a special relationship between the party and the witness[,] or the party has superior knowledge of the identity of the witness or of the testimony the witness might be expected to give; (2) that the witness is available to that party both practically and physically; (3) that the testimony of the uncalled witness will elucidate relevant and critical facts in issue[;] and (4) that such testimony appears to be superior to that already utilized in respect to the fact to be proven.
>
> [State v. Hill, 199 N.J. 545, 561 (2009) (quoting State v. Hickman, 204 N.J. Super. 409, 414 (App. Div. 1985)).]

We conclude the trial court properly declined to grant J.D.'s request for an adverse inference against the State for failing to call M.Z. as a witness. First, as aptly noted by the trial judge, M.Z. was not "peculiarly within the control" of the State. J.D. knew M.Z.'s identity and "could have secured [his] trial testimony by service of a notice in lieu of subpoena on his counsel, pursuant to Rule 1:9-1, by court order, or by consent." Torres v. Pabon, 225 N.J. 167, 183 (2016). We find unconvincing J.D.'s argument that "it simply does not make sense that a defendant would present the testimony of a witness who could potentially corroborate the State's case when the State failed to call that witness."

Secondly, we agree with the trial court that M.Z.'s testimony would not "elucidate relevant and critical facts in issue" because he was not present at either of the sexual assaults and would not be able to provide testimony as to whether J.D. sexually assaulted C.M. Rather, M.Z. was alleged to merely have been at J.D.'s house prior to the second sexual assault and to have left before the assault took place. For the same reasons, M.Z.'s testimony would also not "be superior to that already utilized in respect to" whether J.D. sexually assaulted C.M. See Hill, 199 N.J. at 561. Accordingly, we affirm the trial court's decision declining to impose an adverse inference charge on the State.

Because we are remanding as to the relevance of C.M.'s statements, and because the contents and potential relevance of those statements may ultimately bear upon C.M.'s credibility, we decline to address whether there was adequate, credible evidence in the record to support a finding of delinquency at this time.

Affirmed in part, remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1022-22