SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**Patricia Gilleran v. Township of Bloomfield (A-15-15) (076114)**

**Argued September 13, 2016 -- Decided November 22, 2016**

**LaVecchia, J., writing for a majority of the Court.**

In this appeal, the Court determines whether the security exclusions of the Open Public Records Act ("OPRA"), N.J.S.A. 47:1A-1 to -13, preclude disclosure of the day's worth of video footage from a stationary security camera attached to the Bloomfield Town Hall that Plaintiff Patricia Gilleran requested from the Township of Bloomfield.

Gilleran initially requested footage from a five-day period but settled on one day of recordings when asked by the Township to limit her request. The Township then denied Gilleran's request, citing OPRA's exemption for security information. Gilleran filed a complaint in the Law Division seeking the requested footage under OPRA and the common law right of access.

Gilleran argued that the camera is in plain sight and captures video of a public area. She contended that the videotape is a government record subject to access under OPRA and that the Township should either grant her request in full or review its tapes, redact any exempt portions, and release the remainder. Stressing that OPRA's animating purpose is to grant unfettered public access to government records, Gilleran urged the court to find that none of OPRA's security exemptions creates a blanket exemption for surveillance video footage.

The Township countered that the camera, which is concealed by smoked glass, provides security for the Town Hall and/or the Law Enforcement Building adjacent to the Town Hall. According to the Township, the purpose of providing surveillance would be thwarted if the public were given access to the video records, which might include footage of confidential informants, domestic violence victims, police officers, and others whose safety could be jeopardized by release of the footage. The Township also argued that the videos should remain confidential to protect the secrecy of the capabilities and vulnerabilities of its surveillance system. The Township further asserted that, because review of surveillance video could impose substantial burdens on its resources, it should be able to resist a claim for surveillance videotape based on a security exemption without having to require its employees to review the footage.

The Law Division held that the Township had violated OPRA, ordered the Township to release the requested footage, and directed the parties to discuss reasonable attorney's fees. The Township appealed, and the Appellate Division affirmed the order of the trial court. Gilleran v. Twp. of Bloomfield, 440 N.J. Super. 490, 501 (App. Div. 2015). The panel concluded that OPRA contains no blanket exemption for security information and that determining whether the government must review a recording should be addressed on a case-by-case basis. The panel remanded the matter to the Law Division for a determination as to attorney's fees.

The Court granted the Township leave to appeal. 223 N.J. 402 (2015).

**HELD**: Compelling release on demand of security surveillance video would be contrary to the legislative intent motivating OPRA's exemptions based on security concerns. The Township's explanation for denying the request for the footage was adequate. Requests for video from surveillance cameras protecting public facilities are better analyzed under the common law right of access. The Court therefore reverses the judgment of the Appellate Division and remands the matter for further proceedings based on the unresolved common law claim.

1. OPRA mandates that government records be made "readily accessible" upon citizen request "with certain exceptions[] for the protection of the public interest." N.J.S.A. 41:1A-1. It is the government's burden to show that

a requested record falls within an exception, including one or both of the security exceptions, which protect "emergency or security information or procedures for any buildings or facility which, if disclosed, would jeopardize security of the building or facility or persons therein," as well as "security measures and surveillance techniques which, if disclosed, would create a risk to the safety of persons, property, electronic data or software." Ibid. (pp. 13-14)

2. The Court begins by assuming that surveillance video is a "government record" within the meaning of OPRA because neither party argues otherwise. Observing that a statute's language is the best guide to the Legislature's intent in enacting that statute, the Court then turns to the security provisions quoted above, which it reads in the context of related provisions in order to give meaning to the statute as a whole. (pp 15-16)

3. Viewed together, both security exemptions advance a discernable public policy with respect to the security systems of public buildings. The Court agreed with Gilleran that the two exceptions do not create a blanket exemption for any and all information about security measures. The Court stressed, however, that the two provisions were phrased in a way that allows flexibility in application for public safety purposes. (pp. 16-18)

4. The Court notes that the first exception maintains confidentiality when the release of information produced by certain security tools places at risk the very security system established for the protection of public buildings and people. The second exception reinforces the legislative desire to preclude disclosure of security measures and surveillance techniques that would create a risk for property and persons. Together, these exceptions prevent OPRA requests from interfering with security efforts, including in ways that the Legislature could not have predicted when it enacted OPRA. (pp. 18-19)

5. To protect the confidentiality of security information through one of these exceptions, the government must establish that the security tool (here, the camera) produces information that, if disclosed, would create a risk to the security of the building or the persons therein because of the revealing nature of the product of that tool. In this matter, the Township seeks to protect information about the camera itself, including the scope of the camera's surveillance area, the clarity of the images the camera captures, and the frequency with which it captures images. The Court holds that, when such a concern is present, OPRA's security exemptions bar access to a security system's surveillance product. (pp. 19-22)

6. The Court stresses that this is the sensible application of the security exceptions because, if OPRA were interpreted to require unfettered access to the work product of any camera that is part of a governmental facility's security system, then all such footage from every governmental facility would be subject to release on demand, creating the opportunity for the protection provided by such security systems to be dismantled. A better approach is to analyze requests for security footage under the common law right of access, which allows the need for access to be weighed against the needs of governmental confidentiality. (pp. 22-23)

7. The Court finds that the videotape requested in this matter is not subject to public access under OPRA's security exclusions and that the Township provided an adequate basis for finding the footage to be exempt from release. (pp. 23-24)

**CHIEF JUSTICE RABNER, DISSENTING**, expresses the view that OPRA, by its plain language, does not categorically exempt all security footage from public disclosure. Rather, OPRA requires public agencies to disclose public records, including security footage, unless a specific exception applies. The dissent would thus have remanded the case to the trial court to allow the Township to attempt to establish, based on what appears on the tape, that the requested footage either "would jeopardize security" or "would create a risk to" safety. N.J.S.A. 47:1A-1.1.

The judgment of the Appellate Division is **REVERSED**. The matter is **REMANDED** to the trial court for further proceedings based on the unresolved common law right-to-access claim.


**JUSTICES ALBIN, FERNANDEZ-VINA, AND SOLOMON join in JUSTICE LaVECCHIA's opinion. CHIEF JUSTICE RABNER filed a separate, dissenting opinion in which JUSTICE TIMPONE joins. JUSTICE PATTERSON did not participate.**

PATRICIA GILLERAN,

    Plaintiff-Respondent,

        v.

THE TOWNSHIP OF BLOOMFIELD
and LOUISE M. PALAGANO, in
her capacity as Records
Custodian for the Township of
Bloomfield,

    Defendants-Appellants.


        Argued September 13, 2016 – Decided November 22, 2016

        On appeal from the Superior Court, Appellate
        Division, whose opinion is reported at 440
        N.J. Super. 490 (App. Div. 2015).

        Steven J. Martino argued the cause for
        appellants (Law Department, Township of
        Bloomfield, attorneys).

        CJ Griffin argued the cause for respondent
        (Pashman Stein, attorneys).

        Raymond R. Chance, III, Deputy Attorney
        General, argued the cause for amicus curiae
        State of New Jersey (Christopher S. Porrino,
        Attorney General of New Jersey, attorney;
        Jeffrey S. Jacobson, Counsel to the Attorney
        General, on the letter brief).

        Lance J. Kalik argued the cause for amicus
        curiae American Civil Liberties Union of New
        Jersey (Edward L. Barocas, Legal Director,
        attorney; Mr. Kalik, Mr. Barocas, and Jeanne
        M. LoCicero, of counsel; Mr. Kalik,
        Stephanie R. Wolfe, and John C. Kessler, on
        the brief).

Bruce S. Rosen submitted a brief on behalf of amici curiae The Reporters Committee for Freedom of the Press, Advance Publications, Inc., American Society of News Editors, The Associated Press, Association of Alternative Newsmedia, Dow Jones & Company, Inc., Gannett Co., Inc., Hearst Corporation, Investigative Reporting Workshop at American University, MPA – The Association of Magazine Media, National Association of Black Journalists, National Newspaper Association, National Press Photographers Association, National Public Radio, Inc., The New York Times Company, North Jersey Media Group, Inc., Online News Association, Radio Television Digital News Association, and Society of Professional Journalists (McCusker, Anselmi, Rosen & Carvelli, attorneys).

JUSTICE LaVECCHIA delivered the opinion for the Court.

This appeal arises from a citizen request, pursuant to the Open Public Records Act (OPRA or the Act), N.J.S.A. 47:1A-1 to -13, and the common law right of access, for essentially a day's worth of video footage from a stationary security camera attached to the second-story rear area of Bloomfield Town Hall, adjacent to the police station.

The Township of Bloomfield (Township) declined to release the videotape footage. According to the Township, allowing unrestricted access to security camera videotape -- which would reveal not only what is and is not captured by the security camera, but also when and how well it is captured -- would undermine the purpose of having a security camera system

2

protecting the buildings and people within them.  The Township asserted that the security exclusions of OPRA permitted withholding the videotape.

We granted leave to appeal from the Appellate Division's affirmance of a trial court order compelling release of the video under OPRA.  We conclude that OPRA does not require release of video footage that reveals security capacity for security surveillance systems protecting public buildings. Although we find no OPRA right of access to video footage from such surveillance systems, that does not mean that a citizen may not obtain, when appropriate, some portion of video from a public facility's security surveillance system, but that request must be subjected to the common law balancing of interests under a right-to-know claim.  That common law claim was not reached in this matter so we leave that analysis for another day in the circumstances arising in this appeal.

The security exceptions preserve the confidentiality of

> emergency or security information or procedures for any buildings or facility which, if disclosed, would jeopardize security of the building or facility or persons therein; [and]
>
> security measures and surveillance techniques which, if disclosed, would create a risk to the safety of persons, property, electronic data or software[.]
>
> [N.J.S.A. 47:1A-1.1.]

3

The wholesale release of videotape footage from a surveillance camera, which is part of a government facility's security system protecting its property, workers, and visitors, would reveal information about the system's operation and also its vulnerabilities, jeopardizing public safety. The compelled release under OPRA, on demand for any or no reason, of a security system's operational product revealing otherwise nonpublic information about monitoring capability is at odds with the legislative intent in creating security exceptions to OPRA. The security exceptions will be applied in a commonsense manner that fulfills the very purpose of having security-based exceptions, and we will do so mindful of present day practical challenges to maintenance of security in public facilities.

We hold that the security exclusions preclude disclosure under OPRA of the videotape requested in this matter.

I.

On April 7, 2014, plaintiff Patricia Gilleran emailed the Township's Records Custodian requesting five days' worth of footage -- March 31, 2014 to April 4, 2014, from 7:00 a.m. to 9:00 p.m. -- from a stationary security camera, which was attached to the back of the municipal building and which, she claimed, appeared to be directed toward the rear of Town Hall and a parking area that encompassed the Mayor's parking space.

4

A clerk[1] for the Township spoke with Gilleran, indicated that five days of footage would be voluminous, and asked if the request could be winnowed. Gilleran accordingly reduced her request to one day of recordings: March 31, 2014, from 7:00 a.m. to 9:00 p.m. On April 11, 2014, Gilleran was informed by email that her request was denied pursuant to OPRA's exemption for security information.

Gilleran commenced this action against the Township and its Records Custodian by filing a complaint in the Law Division seeking the requested footage under OPRA and the common law right of access. According to her complaint, plaintiff seeks the video footage to determine whether certain people had entered the municipal building. The complaint further alleges that the camera is in plain sight and captures video of a public area. Four photographs of the surveillance camera were appended to the complaint to depict that the camera is affixed to the second story of the municipal building's wall, above a parking lot that includes the Mayor's parking space.

The complaint contends that the videotape is a government record subject to access under OPRA and requests the court either to direct the Township to release the requested footage

---

[1] In different places in the record, this person is listed as a "clerk/typist," a records custodian, or an employee in the Municipal Clerk's office who frequently responds to OPRA requests.

5

or to review the tapes in camera and order defendants to redact portions of the tape that are exempt and release the remainder. The complaint also demands the award of a civil penalty and attorney's fees under OPRA. The complaint also seeks release of the videotape under the common law right of access.

In its answer, the Township contends that the footage is exempt as security information. The Township submitted two certifications: one from the clerk who responded to Gilleran's request and the other from Ted Ehrenburg, Bloomfield's Township Administrator. Ehrenburg certified that:

> 3. [] The camera from which the video was requested is located on the rear of Town Hall on the second story. Without revealing security information, the camera provides security for Town Hall and/or the Law Enforcement Building adjacent to Town Hall.
>
> 4. The cameras are strategically placed and smoked glass is placed over the cameras so that the public does not know the area that is being surveilled.
>
> 5. Allowing access by the public to the video surveillance would defeat the entire purpose of having security cameras on Town Hall.
>
> 6. Again, without revealing security information, the area which is potentially surveilled is not only used by public employees but Police Officers who report to and from work, confidential informants who are brought into the Police Station, witnesses who are brought into the Police Station, domestic violence victims who are brought into the Police Station and members of the public who seek to report crimes.

7. If the public is given access to the video tapes, the safety of these individuals could be put in jeopardy.

8. Therefore, video surveillance which is essential to the security of the township buildings should not be provided to the public.

On the return date of the court's order to show cause, plaintiff argued that, because the case presents a novel OPRA issue, the court's focus should be on the Act's animating principle, which is to grant unfettered public access to government records. Plaintiff urged the court to find that none of OPRA's security exemptions creates a blanket exemption for surveillance video footage based on a concern for security and that, therefore, the Township was obliged to examine the video to determine whether some portion of its contents would pose a security risk. Plaintiff's argument emphasized that the camera was placed in an obvious and public place and that one can stand outside the building and observe the same people entering and leaving the building that the tape would have recorded.

The Township argued that its employees should not be required to review security footage for the Township to resist a claim for surveillance videotape based on a security exemption. From a practical perspective, the Township maintained that requiring Township employees to review security footage for every public request could impose substantial burdens on the

7

Township's resources. The Township acknowledged that no Township official had viewed the entire footage before claiming a security exemption under OPRA for plaintiff's request; nevertheless, the Township argued that the footage could pose security risks because it might reveal undercover officers, witnesses, or victims seeking to maintain confidentiality. More fundamentally, the Township contended that the videos should remain confidential so the Township can maintain the secrecy of the scope of the security surveillance system.

The Law Division held that the Township was in violation of OPRA and ordered release of the requested video footage within five days. The court also directed the parties to attempt agreement on reasonable attorney's fees under N.J.S.A. 47:1A-6.

On July 1, 2014, the Township filed motions for leave to appeal and for a stay pending appeal, maintaining that "there is a security risk if [the tape is] produced," and that the "revealing of security measures and surveillance techniques would create a risk of [sic] the safety of persons in the Township." The Appellate Division granted the stay on July 2, 2014. The Appellate Division also granted the application of the American Civil Liberties Union of New Jersey (ACLU-NJ) for amicus curiae status.

On May 13, 2015, the Appellate Division affirmed the order of the trial court. Gilleran v. Twp. of Bloomfield, 440 N.J.

8

Super. 490, 501 (App. Div. 2015). The panel rejected the Township's argument that the fact that the video camera footage was part of a security system should have been sufficient justification to deny access. Id. at 497. Based on a statutory construction analysis, the panel held that OPRA's statutory exclusions addressing security do not provide a blanket exemption for all security information. Ibid.

Further, the appellate panel held that the record lacked sufficient specific information for it to conclude that activities and individuals' identities revealed on the tape would pose a security risk if the tape were released. Id. at 498. That said, the panel declined to conclude that an agency must review requested video recordings in order to claim an exemption based on security reasons, acknowledging that such a requirement could be unreasonably burdensome. Ibid. Rather, the panel stated that determining whether the government must review a recording should be addressed on a case-by-case basis, taking into consideration the length of the requested recordings and the nature of the information contained therein. Id. at 500. The Appellate Division remanded the matter for additional proceedings related only to the award of fees. Id. at 501.

Because final judgment had not yet been rendered, the Township properly sought leave to appeal to this Court, which we

9

granted.  223 N.J. 402 (2015).[2]  The ACLU-NJ, which had been granted amicus curiae status before the Appellate Division, filed an amicus brief in support of Gilleran.  The Reporters Committee for Freedom of the Press and eighteen media organizations were granted amicus curiae status and filed a brief urging rejection of a "blanket exception" for surveillance videos.  We also granted amicus curiae status to the Attorney General of New Jersey, who filed a brief in support of the Township.

## II.

The key distinction in the arguments of the parties lies in how to interpret the security exceptions, both of which include the phrase, "if disclosed," in identifying the type of security information or other material that is excluded from access as a "government record."  The parties further disagree on whether the security exceptions require the review and redaction of discrete material that can be identified as posing a security risk, subject to cost shifting and other accommodations generally provided for through N.J.S.A. 47:1A-5.

Plaintiff and the amici who support her right to request access to the security videotape believe that individualized review and excision is necessary to give meaning to the phrase,

---

[2]  A related notice of petition for certification was dismissed.

"if disclosed," in the two security exclusions. Plaintiff and amici argue that the phrase requires the Township to review the tapes and excise only those portions of the tape that would create a security risk "if disclosed."

Plaintiff and amici also suggest that, if the Township is not required to review the tapes, then the Court will have interpreted the exception to be a "blanket exception" for all security measures. They point out that other OPRA exemptions containing similar "if disclosed" language have been applied to require an individualized assessment of the requested government record, with release authorized for those portions that do not pose the demonstrated risk that the exclusion seeks to avoid. Here they emphasize that the Township made no effort to demonstrate that portions of the video "would jeopardize" security because the Township acknowledged that no one had viewed the tape in its entirety.

The Township and the Attorney General view the security exclusions differently. They dispute that the videotape merely provides information equivalent to that which a member of the public would otherwise view standing outside in the surveilled public place. Rather, they maintain that videotape from the Township's stationary security camera, which is otherwise not available to be seen by the public, would disclose security information that reveals the security system's operation and

11

vulnerabilities -- what the government can view from the inner workings of its security system. They maintain that allowing general public access to their security measures, procedures, and techniques is contrary to the purpose of the security exceptions.

Accordingly, they argue that the revealing information ordered to be released -- which would normally be known only to those who could see through the camera's lenses or, in other words, who can view what the camera's tapes capture, when, and how well -- was intended to be exempt as a category of information under the security exclusions. They emphasize that the security exclusions' purpose in shielding the release of such sensitive information about a security system is designed to foster protection of public buildings and the people within them. They further argue that courts should apply the security exclusions and deny public access to a security system's video when the government produces a certification that such information must remain confidential to avoid jeopardizing the security system's operation.

In further response to plaintiff's and the ACLU-NJ's position, they contend that their interpretation neither renders the "if disclosed" language meaningless nor creates a blanket exception for security-related information. They maintain that other security-related records remain available on request,

12

subject to excision as needed prior to release. Their position also allows for release, based on a showing of need balanced against the government's interests, through the common law right of access.

III.

Any analysis of OPRA must begin with the recognition that the Legislature created OPRA intending to make government records "readily accessible" to the state's citizens "with certain exceptions[] for the protection of the public interest." N.J.S.A. 47:1A-1 (declaring public policy animating OPRA). OPRA substantively provides that "all government records shall be subject to public access unless exempt," N.J.S.A. 47:1A-1, and it places on the government the burden of establishing an exemption, N.J.S.A. 47:1A-6. See Mason v. City of Hoboken, 196 N.J. 51, 66-67 (2008). The Act sets forth in detail the manner in which requests for inspection, examination, and copying of government records are to be addressed, at times underscoring the responsiveness and cooperation expected from custodians. See N.J.S.A. 47:1A-5.

OPRA expansively defines "Government record" or "record" to include

> any paper, written or printed book, document, drawing, map, plan, photograph, microfilm, data processed or image processed document, information stored or maintained electronically or by sound-recording or in a

similar device, or any copy thereof, that has been made, maintained or kept on file in the course of his or its official business by any officer, commission, agency or authority of the State or of any political subdivision thereof.

[N.J.S.A. 47:1A-1.1.]

However, the Legislature established public-policy exceptions from that definition, declaring that "[a] government record shall not include . . . information which is deemed to be confidential." Ibid. Included in the information that the Legislature decreed to be confidential is

emergency or security information or procedures for any buildings or facility which, if disclosed, would jeopardize security of the building or facility or persons therein;

as well as

security measures and surveillance techniques which, if disclosed, would create a risk to the safety of persons, property, electronic data or software.

[Ibid.]

We now evaluate whether those exceptions were intended to exempt from disclosure the security camera videotape that plaintiff requested through OPRA.

IV.

We begin our analysis with the assumption that video footage from a security camera is a "government record" under OPRA because no party has challenged that starting point, and we

14

proceed directly to whether video footage from a public facility's security surveillance camera is exempt from disclosure based on the public-interest policy concerns underlying the two security-related exemptions. See N.J.S.A. 47:1A-1 (characterizing exceptions as having been created "for the protection of the public interest").

The two government-record exemptions at issue categorize types of information or content sought to be excluded based on security concerns. One exemption addresses "security information or procedures . . . which, if disclosed, would jeopardize security of the building or facility or persons therein." N.J.S.A. 47:1A-1.1 (emphasis added). The other addresses "security measures and surveillance techniques which, if disclosed, would create a risk to the safety of persons [or] property." Ibid. (emphasis added).

Our task plainly involves statutory construction, the objective of which is to effectuate legislative intent. Cashin v. Bello, 223 N.J. 328, 335 (2015). The best source for direction on legislative intent is the very language used by the Legislature. See State v. Gandhi, 201 N.J. 161, 176 (2010).

The words used by the Legislature in the applicable exemptions capture categories of information. Their terminology transcends reference to a singular document, or like item, that can be reviewed for redaction and encompasses material that

15

provides insight into security methods and modalities.  The first exemption references "security <u>information</u> or <u>procedures</u>" the disclosure of which would jeopardize security of public buildings.  <u>N.J.S.A.</u> 47:1A-1.1 (emphasis added).  The second speaks even more broadly in precluding disclosure of a category of information, specifically reaching records that reveal "<u>security measures</u> and <u>surveillance techniques</u>" so as not to place at risk the safety of property, which includes public buildings, and people.  <u>Ibid.</u> (emphasis added).  Our job is to understand the intent that animated those exemptions and to give it effect.  <u>Cashin</u>, <u>supra</u>, 223 <u>N.J.</u> at 335.  We do so fully aware that the Legislature also stated that "any limitations on the right of access . . . shall be construed in favor of the public's right of access."  <u>N.J.S.A.</u> 47:1A-1.  In attempting to understand what the Legislature intended, a court does not "view the statutory words in isolation but 'in context with related provisions so as to give sense to the legislation as a whole.'"  <u>Murray v. Plainfield Rescue Squad</u>, 210 <u>N.J.</u> 581, 592 (2012) (quoting <u>DiProspero v. Penn</u>, 183 <u>N.J.</u> 477, 492 (2005)).

Viewed together, both security exemptions advance a discernible public policy with respect to the security systems of public buildings, such as we have here.  The two exemptions endeavor to keep from public scrutiny a swath of information that, if disclosed, would jeopardize or would undermine the

16

effectiveness of the security system for public buildings (property) and the people within them.  We seek meaning and intent of the two exemptions by viewing them in context with each other.  Murray, supra, 210 N.J. at 592.

We begin by agreeing with plaintiff that the Legislature was not creating a blanket exception for any and all information about security measures.  Such a clear and direct exclusion could have been written, but that is not how the exemptions are fairly read.  The "if disclosed" phrase must have meaning.  See State v. Regis, 208 N.J. 439, 449 (2011) (stating that legislative words are not presumed superfluous).  Certainly, there are types of security-related information that would appear disclosable without violating the Legislature's overarching concern about the maintenance of public security and safety.  Examples could include public-bidding documents in connection with acquisition of a security system and documents revealing the cost of the system.  Such examples were readily acknowledged during argument in this matter.  Thus, the exception does not create a "blanket exception" for all security-system-related material, as feared by plaintiff and amici.

However, the Legislature plainly was concerned about public-safety consequences when creating a shield in OPRA from

17

the on-demand public disclosure of information that relates to public-facility security concerns.

Even if neither security exception is meant to operate as a blanket exception, the Legislature's exceptions -- written without knowing the extent of the public safety challenges that the future might bring -- were phrased in a way that allows flexibility in application for security purposes. They maintain the confidentiality of information categories when disclosure of the information, considering the totality of its worth, would compromise the integrity of a security system and defeat the purpose to having security exceptions in OPRA.

The first exception allows for the maintenance of secrecy when the consequence of releasing information produced by certain security tools places at risk the very security system established for the protection of public buildings and people. The second reinforces the legislative desire to preclude disclosure of security measures and surveillance techniques that would create a risk for property and persons. The language of those exceptions broadly permits a categorical exception if the information's disclosure would create the very danger the security measures and surveillance techniques were meant to thwart.

Current events since the new millennium make evident the present day difficulties of maintaining daily security for

18

public buildings and people using them.  The security exceptions prevent OPRA requests from interfering with such security efforts.  Even if the Legislature could not have predicted precisely all the many types of criminal, terroristic events that have happened since OPRA was enacted, the Legislature created flexible exceptions to preserve public safety and security.  Now, we know that knowledge of the vulnerabilities of a security system could allow an ill-motivated person to know when and where to plant an explosive device, mount an attack, or learn the movements of persons, placing a public building or persons at risk.  Information that reveals the capabilities and vulnerabilities of surveillance cameras that are part of a public facility's security system is precisely the type of information that the exceptions meant to keep confidential in furtherance of public safety.

To achieve exemption for such a category of security information, the governmental entity must establish that the security tool (here, the camera) produces information that, if disclosed, would create a risk to the security of the building or the persons therein because of the revealing nature of the product of that tool.  We have recognized before the significance of the release of a "government record" when the mining of information from the government record can defeat the very purpose of the OPRA exclusion.  In Education Law Center v.

19

New Jersey Department of Education, 198 N.J. 274 (2009), this Court considered the impact that release of a document under OPRA would have on thwarting the purpose of an exclusion recognized under the Act. Specifically, we considered whether the release of a record that contained factual components could be subject to the deliberative-process privilege recognized and protected under OPRA. Id. at 299. In concluding that disclosure of a seemingly fact-based document could reveal deliberative content because that protectable type of information could be gleaned from thoughtful and contextual review of the document, id. at 299-300, we held that the purpose to be served by the exception had to be honored in the case before the Court, id. at 300-02. The Court took a practical approach to preserving the purpose intended to be achieved by the legislative creation of the exemption.

Here, we cannot allow ourselves to be blind to the very purpose of the security exceptions in issue. When determining whether OPRA meant to require the wholesale release of such security videotape, on demand, we must consider the videotape as a whole, with due regard for the information it can reveal about the Township's security system. If the release of the product of a security system can lead to the undermining of the legislative public-interest policy embedded in the security exclusions, the exemption protecting such information to avoid

20

the risk of jeopardizing the security protection surely was intended to prevail in order to protect public safety.[3]

In this matter, the scope of the camera's surveillance area (the width, depth, and clarity of the images, as well as when it operates, i.e. intermittently and, if so, at what intervals and are they regular) is the information that the Township seeks to protect. That the video may contain depictions of otherwise non-confidential views of an area outside a public building or may capture persons moving in a public area is not a complete way in which to assess the security worth of this requested government record. Such analysis provides a stunted review for addressing the purpose underlying the security exemptions.

No doubt the security exceptions recognize the need, in some instances, to deny access to only a portion of a government record in order to avoid placing at risk the safety of a person identifiable on the videotape.[4] But when the public-security

---

[3] On this point, the dissent describes the majority opinion as not giving effect to the second prong of analysis under the exceptions, namely that the disclosure would jeopardize security or would create a risk to safety. See infra at __ (slip op. at 9). That mistakes our analysis. Although under our interpretation of the statutory exemption no security footage can pass the second part of the test embedded in the exception, that is not to say that all security information is exempt because, as noted, security information includes more than just security video footage. The statutory language from the second prong to the exceptions is not omitted in our analysis.

[4] When that is the only basis asserted for non-disclosure of an otherwise disclosable government record, then it would be

21

concern is that access to the videotape product of the surveillance medium itself reveals security-compromising information, then the exemptions can be relied on to bar, categorically, under OPRA, a security system's otherwise confidential surveillance product.

A sensible application of the security exceptions supports denying release of information that undermines the operation of a government facility's security system. Compelling the wholesale release to the public of videotape product of any security camera, or combination of cameras, from a government facility's security system would reveal information about a system's operation and also its vulnerabilities. Once OPRA is interpreted to require unfettered access to the work product of any camera that is part of a governmental facility's security system, then footage from security cameras in all governmental facilities -- police stations, court houses, correctional institutions -- would be subject to release on demand. It takes no stretch of the imagination to realize that that would make it possible for any person to gather the information necessary to dismantle the protection provided by such security systems.

_____

appropriate for the governmental entity to review the tapes and redact or excise certain portions. OPRA allows for cost shifting for the additional burden on public resources should that form of search expedition be requested in an appropriately tailored way. See N.J.S.A. 47:1A-5.

Requests for videotape product from surveillance cameras protecting public facilities are better analyzed under the common law right of access where the asserted need for access can be weighed against the needs of governmental confidentiality.  See O'Boyle v. Borough of Longport, 218 N.J. 168, 196-97 (2014) (noting that "the party requesting documents must explain why he seeks access to the requested documents" and relating three-part test used for evaluation of such requests); Educ. Law Ctr., supra, 198 N.J. at 302.  We can envision circumstances when the need for access to a portion of a videotape, redacted as necessary, may justify release of the requested material.  For example, an accident occurring in an area surveilled near a public building or an incident of claimed brutality or misconduct captured on a facility's security videotape may provide a legitimate interest to justify a partial disclosure under the common law right of access.[5]  Plaintiff's common law right of access claim was never reached in this matter and so that balancing-of-interest analysis was not performed.  That is the context in which the give and take emphasized by the dissent should take place when security

---

[5]  This Court also recognized recently the possibility of a judicially fashioned remedy that could include the required release of a portion of security videotape from cameras inside and outside a police building as part of required discovery in a DWI prosecution.  See State v. Stein, 225 N.J. 582, 600-01 (2016).

23

videotape, capable of revealing vulnerabilities of the security system itself, is requested.

That said, we conclude that the broad brush of compelled release under OPRA, on demand for any or no reason, of the Township's security system's surveillance videotape product, revealing its capabilities and vulnerabilities, is contrary to the legislative intent motivating OPRA's exemptions based on security concerns. We hold that the videotape requested in this matter is not subject to public access under OPRA's security exclusions. Although a more expansive explanation by the Township would have been preferable, we are satisfied that the Township provided an adequate basis, through Mr. Ehrenberg's certification, as buttressed by argument, to support its position that allowing general public access under OPRA to the video footage from the surveillance camera on Town Hall and the adjacent police station would undermine the security purpose of the camera and of the security system of which it is but a part.

V.

The judgment of the Appellate Division is reversed and the matter is remanded for further proceedings based on the unresolved common law right-of-access claim.

JUSTICES ALBIN, FERNANDEZ-VINA, AND SOLOMON join in JUSTICE LaVECCHIA's opinion. CHIEF JUSTICE RABNER filed a separate, dissenting opinion in which JUSTICE TIMPONE joins. JUSTICE PATTERSON did not participate.

24

PATRICIA GILLERAN,

    Plaintiff-Respondent,

       v.

THE TOWNSHIP OF BLOOMFIELD
and LOUISE M. PALAGANO, in
her capacity as Records
Custodian for the Township of
Bloomfield,

    Defendants-Appellants.


    CHIEF JUSTICE RABNER, dissenting.

    This is a case of statutory interpretation.  The outcome should depend on the language the Legislature used -- or chose not to use -- in the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13.

    OPRA provides the public with access to government records. N.J.S.A. 47:1A-1.  Unless an exception in the statute applies, the law affords citizens a broad right of access.  Ibid. Relying on the statute, Patricia Gilleran asked the Township of Bloomfield for footage from a video surveillance camera that is visible to the public and focuses on the back of Bloomfield's Town Hall.  The Township denied the request, and this action followed.

1

The trial court found that OPRA does not create a "blanket exemption" for the disclosure of security tapes and ordered Bloomfield to disclose the footage. The Appellate Division affirmed. It carefully analyzed the language of the statute and agreed that "the statutory exclusions do not provide a blanket OPRA exemption for recordings made from security cameras." Gilleran v. Twp. of Bloomfield, 440 N.J. Super. 490, 497 (App. Div. 2015). The panel also found that the Township did not meet its burden to establish that either of OPRA's two security-related exceptions applies. Id. at 498.

The majority takes a different approach. It concludes that all footage from security cameras is exempt from disclosure under OPRA because the footage would reveal the "capability" and "vulnerabilities" of the government agency's security system. See ante at __, __, __ (slip op. at 4, 22, 24). The majority offers sound reasons why that approach makes sense. But the Court's decision cannot overcome a fundamental problem: OPRA does not say that all security footage is categorically exempt from public disclosure. The Legislature could have written that standard into the law but did not. Instead, OPRA requires public agencies to disclose government records unless a specific exception applies, and the relevant exceptions do not exempt all security footage from disclosure. According to the language of the statute, the Township must demonstrate that surveillance

2

footage "would jeopardize security" or "would create a risk to" safety to be exempt from disclosure.  N.J.S.A. 47:1A-1.1.  The Township has not made that showing and, therefore, has not met its burden under the law.

Courts must be guided by the Legislature's policy choices, which appear in the words of the relevant statutes.  Because, in my view, the majority has not followed the plain language of OPRA, I respectfully dissent.

I.

The statute provides the critical backdrop to this case. OPRA is designed "to maximize public knowledge about public affairs in order to ensure an informed citizenry."  Mason v. City of Hoboken, 196 N.J. 51, 64 (2008) (quoting Asbury Park Press v. Ocean Cty. Prosecutor's Office, 374 N.J. Super. 312, 329 (Law Div. 2004)).

At the outset of the law, the Legislature declared that "government records shall be readily accessible for inspection, copying, or examination by the citizens of this State, with certain exceptions, for the protection of the public interest, and any limitations on the right of access . . . shall be construed in favor of the public's right of access."  N.J.S.A. 47:1A-1 (emphasis added).

The law's overall design is straightforward.  "[A]ll government records shall be subject to public access unless

3

exempt." Ibid. OPRA defines "government record[s]" broadly. N.J.S.A. 47:1A-1.1. The law covers "information stored or maintained electronically," which a political subdivision of the State made or maintained in the course of its official business. Ibid. The statute also exempts certain items from disclosure; the Legislature expressly carved out two dozen areas from the meaning of "government record." Ibid. OPRA places the burden on public agencies to prove that an exception applies. N.J.S.A. 47:1A-6.

The law also provides various ways for agencies to limit disclosure. For example, as a general rule, before custodians allow access to government records, they must redact social security numbers, credit card numbers, unlisted telephone numbers, or driver license numbers from the records requested. N.J.S.A. 47:1A-5. When part of a record is exempt from disclosure, "the custodian shall delete or excise" that portion and "shall promptly permit access to the remainder of the record." N.J.S.A. 47:1A-5(g). Also, "[i]f a request for access to a government record would substantially disrupt agency operations, the custodian may deny access to the record after attempting to reach a reasonable solution with the requestor." Ibid. And if "an extraordinary expenditure of time and effort" is needed "to accommodate" a request, the agency may charge a reasonable "special service charge" based on the actual cost of

4

providing the copies requested.  N.J.S.A. 47:1A-5(c); see also

N.J.S.A. 47:1A-5(d) (allowing reasonable service charges related

to information technology).

II.

No party disputes that the surveillance footage sought in

this case is a "government record."  The question before the

Court is whether any exceptions apply to Ms. Gilleran's request.

The Township relies on two exceptions in the statute:

> emergency or security information or procedures for any buildings or facility which, if disclosed, would jeopardize security of the building or facility or persons therein; [and]
>
> security measures and surveillance techniques which, if disclosed, would create a risk to the safety of persons, property, electronic data or software.
>
> [N.J.S.A. 47:1A-1.1 (emphasis added).]

Neither exception announces a blanket rule that applies to an

entire category of information.  Yet the Legislature

specifically used that approach in other areas.  It exempted

"criminal investigatory records" from disclosure -- without

qualification.  N.J.S.A. 47:1A-1.1.  The same is true for

"information . . . to be kept confidential pursuant to court

order."  Ibid.  Likewise, "information contained on individual

admission applications" to any public institution of higher

education is exempt across the board.  Ibid.

5

The Legislature, however, did not exempt all "emergency or security information" or all "security measures and surveillance techniques." Instead, OPRA excludes from the definition of "government record" only information or footage that, respectively, "would jeopardize security" or "would create a risk to" safety. Ibid.

To satisfy its burden and establish that the above exceptions applied, Bloomfield submitted a certification from its Township Administrator. He explained that "the camera provides security for Town Hall and/or the [adjacent] Law Enforcement Building." He argued that video surveillance footage should not be disclosed because that "would defeat the entire purpose of having security cameras on Town Hall." He added that "the public does not know the area that is being surveilled." In addition, he explained that the safety of police officers, confidential informants, witnesses, domestic violence victims, and members of the public who enter the police station "could be put in jeopardy." (Emphasis added.)

The general language of the certification does not establish that the safety of any of those individuals would be jeopardized -- the standard used in the statute. In fact, because no one has examined the footage in question, the Township cannot represent that any confidential informants, witnesses, or victims appear on the tape. Beyond that, as the

6

Appellate Division noted, the Township did not demonstrate that some feature of the camera would create a risk of harm if the footage were released.  See Gilleran, supra, 440 N.J. Super. at 498.  In short, the Township has not met its burden of proof -- that disclosure "would jeopardize security" or "would create a risk to" safety -- as the law requires.

To be sure, the Township could have availed itself of remedies that OPRA provides.  It could have reviewed the surveillance tape and redacted parts that, in fact, "would create a risk to the safety of persons" or "would jeopardize security."  N.J.S.A. 47:1A-1.1.  The Township, for example, could have redacted portions that depict any confidential informants.  It could have cropped blind spots from the videotape in order not to reveal the system's limitations.  If the Township could demonstrate that the manner and level of review required "would substantially disrupt" the Township's operations, it could have denied access after first "attempting to reach a reasonable solution with the requestor."  N.J.S.A. 47:1A-5(g).  In other words, Township officials could have negotiated with Ms. Gilleran about the scope of the request and asked her to narrow it further.  At oral argument, counsel for Ms. Gilleran represented that she would have narrowed the request if asked.  The Township could have also added a reasonable special service charge if satisfying the request

7

involved "an extraordinary expenditure of time and effort." N.J.S.A. 47:1A-5(c). But the Township did none of those things. Instead of speaking further with Ms. Gilleran, it simply denied her revised request for one day of video footage.

The majority finds that the release of security camera footage "would reveal information about a system's operation and also its vulnerabilities." See ante at __ (slip op. at 22). According to the majority, such disclosures are "at odds with the legislative intent in creating security exceptions to OPRA." Id. at __ (slip op. at 4). The majority therefore concludes that footage from security cameras, which presumably reveals sensitive security information, is exempt from disclosure under OPRA. Id. at __, __, __ (slip op. at 4, 21, 24).

That may be a sensible approach as a matter of policy. The American Civil Liberties Union of New Jersey, the Reporters Committee for Freedom of the Press, and the media organizations that appear as amici strongly argue otherwise. But what matters in this appeal is what the Legislature said when it made policy choices in the body of the statute. The Legislature did not create a wholesale exception for security footage. Instead, it drafted two security exceptions that each contain two prongs: (1) the material sought must relate to "emergency or security information" or "security measures and surveillance techniques"; and (2) the agency must show that disclosure "would jeopardize

8

security" or "would create a risk to" safety.  N.J.S.A. 47:1A-1.1.  Unless both prongs are met, the exceptions cannot apply.

The Court, however, effectively exempts security footage from disclosure across the board because of what the footage might reveal about how a security system operates.  That standard is quite broad.  Indeed, it is hard to see how security footage that covers even a modest amount of time could pass the majority's test.  Beyond that, the Court's reading of the law gives no meaning to the second prong in both statutory exceptions.  The analysis, therefore, runs contrary to a basic rule of statutory interpretation.  Courts should give effect to every word of a statute and not read a law in a way that renders language superfluous.  See H.S.P. v. J.K., 223 N.J. 196, 207 (2015); In re N.B., 222 N.J. 87, 101 (2015); State v. Regis, 208 N.J. 439, 449 (2011).

I would instead address both prongs of OPRA's security exceptions, as the Appellate Division did.  The panel noted that the Township

> provided no information . . . to indicate that important security strategies or techniques would be disclosed.  For example, there was no indication that the security camera might have blind spots in its apparent surveillance areas, or that the clarity and sharpness of the imagery recorded would be revealed in a way that might compromise the strategic deterrent effect of the security camera or overall security system of the building.

9

[Gilleran, supra, 440 N.J. Super. at 498.]

In my view, the panel correctly found that the Township's certification contained general statements that "were insufficient to justify withholding the recordings from disclosure." Ibid.

                            III.

Security cameras have been around for a long time -- well before OPRA was enacted in 2002.[6] Their purpose has always been to protect public safety. Against that backdrop, OPRA placed particular conditions on when security footage could and could not be disclosed; the language of the statute simply did not exempt all footage from disclosure.

The Legislature, of course, is free to rewrite and broaden the security-related exceptions in the law. It can craft a categorical exception for security footage as it has done in other areas. But it is for the Legislature, not the courts, to modify the text of a statute.

---

[1] OPRA significantly altered and expanded upon the Right to Know Law, which had been enacted in 1963. Compare L. 1963, c. 73, with L. 2001, c. 404. Both security provisions were added as part of the new law. L. 2001, c. 404, § 1. The Assembly and Senate voted to adopt OPRA in early January 2002; the Governor signed the bill on January 8, 2002. Ibid. Just months before, our nation witnessed the tragic events of September 11, 2001. It is therefore not correct to suggest that the Legislature could not have predicted modern-day security issues and acts of terror when it enacted OPRA. See ante at __-__ (slip op. at 18-19).

                            10

When called on to interpret a statute, courts must examine the plain language of the law and give effect to the words the Legislature used.  Morristown Assocs. v. Grant Oil Co., 220 N.J. 360, 380 (2015); State v. Terry, 218 N.J. 224, 234 (2014).  To give sense to the statute as a whole, courts review particular language "in context with related provisions."  Murray v. Plainfield Rescue Squad, 210 N.J. 581, 592 (2012) (quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005)); see also Burnett v. Cty. of Bergen, 198 N.J. 408, 421 (2009).  Here, the broad exceptions the Legislature crafted for other categories of information offer telling context.

OPRA itself adds another important rule of statutory construction.  The law expressly declares that "any limitations on the right of access . . . shall be construed in favor of the public's right of access."  N.J.S.A. 47:1A-1.  Reading OPRA's security exceptions to exempt all security footage heads in the opposite direction.

IV.

The Court remands this matter for further proceedings to assess what information might be available for disclosure under the common law right of access.  The majority believes that requests for surveillance videos "are better analyzed under the common law."  See ante at __ (slip op. at 23).

11

The common law right of access, while important in its own right, is not a substitute for OPRA. OPRA presumes that records will be released unless an agency can show that they are wholly or partially exempt from disclosure. Under the common law, requestors have access to a broader array of records but "must make a greater showing than required under OPRA." Mason v. City of Hoboken, 196 N.J. 51, 67 (2008). The common law right of access shifts the burden and requires requestors to "establish an interest in the subject matter of the material." Ibid. (quoting Keddie v. Rutgers, 148 N.J. 36, 50 (1997)). That interest "must outweigh the State's interest in non-disclosure." Educ. Law Ctr. v. N.J. Dep't of Educ., 198 N.J. 274, 303 (2009). Counsel also stressed a more practical difference between the two types of claims. Counsel observed that because attorney's fees are available to a prevailing party under OPRA, see N.J.S.A. 47:1A-6, but have not been available under the common law, fewer parties will be likely to pursue only common law requests in court.

V.

The Township presented a legitimate legal argument about the scope of two OPRA exceptions, as to which there was little guidance in existing case law. The Township declined to disclose the surveillance footage without first examining what the tape contained. Under the circumstances, I would not order

12

disclosure of the tapes at this time.  I would instead remand the case to the trial court and permit the Township to try to satisfy either of the security-related exceptions in OPRA based on what appears on the tape.  The Township would then be in a position to redact portions of the tape prior to disclosure, if it could establish that those parts "would jeopardize security" or "would create a risk to" safety.  N.J.S.A. 47:1A-1.1.

For those reasons, I respectfully dissent.

13